IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

**ELECTRIC BOAT CORPORATION**
75 Eastern Point Road
Groton, CT 06340

**Plaintiff,**

v.

**UNITED STATES OF AMERICA**

**Defendant.**

**CIVIL ACTION NO. 15-461**

**COMPLAINT FOR RECOVERY OF RESPONSE COSTS**
**AND FOR DECLARATORY RELIEF**

1.  Electric Boat Corporation ("Electric Boat" or "Plaintiff") brings this action against the United States of America (the "Government" or "Defendant") for cost recovery, contribution, and declaratory relief under Sections 107 and 113 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), as amended, 42 U.S.C. §§ 9607, 9613. Electric Boat's CERCLA claims involve facilities located at approximately 165 Dillabur Avenue, North Kingstown, RI 02852 (the "Quonset Point Facility") at which trichloroethylene ("TCE") and other hazardous substances have been detected in the soil and groundwater. Plaintiff seeks to recover investigation, response, remediation and cleanup costs, including, but not limited to, all costs incurred in the past and to be incurred in the future to address soil and groundwater contamination either caused by the disposal of hazardous substances when the Government owned or operated the Quonset Point Facility or caused by the Government when it arranged for the disposal of hazardous substances at the Quonset Point Facility.

## THE PARTIES

2.      Plaintiff Electric Boat is a Delaware corporation with its principal place of business in the State of Connecticut.  Electric Boat also conducts business in the State of Rhode Island.

3.      Defendant United States resides and may be found in the State of Rhode Island. The Government conducts business in Rhode Island through its various agencies, including the Environmental Protection Agency, the General Services Administration, and the Departments of Defense and the Navy, and their predecessors in interest, and through its former agencies.  The Government is a "person" as defined in Section 101(21) of CERCLA, 42 U.S.C. § 9601(21), and has waived its sovereign immunity pursuant to Section 120(a) of CERCLA, 42 U.S.C. § 9620(a).

## JURISDICTION AND VENUE

4.      This Court has jurisdiction pursuant to Sections 107(a) and 113(b) of CERCLA, 42 U.S.C. §§ 9607(a) and 9613(b), and 28 U.S.C. § 1331.

5.      Venue is proper in this judicial district pursuant to Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), and 28 U.S.C. § 1391(b) and (e), because the release or damages occurred within this district, and further because the Defendant resides or may be found within this district.

## GENERAL ALLEGATIONS COMMON TO ALL CLAIMS RELATED TO THE ESCAPE OF HAZARDOUS SUBSTANCES FROM THE QUONSET POINT FACILITY

6.      The Quonset Point Facility is a former Naval Air Station ("NAS") and Naval Air Rework Facility ("NARF"), and is currently a submarine manufacturing, outfitting, and modular-construction facility located at approximately 165 Dillabur Avenue, North Kingstown, RI 02852.

7.      Between approximately 1939 and approximately 1974, the Government owned and operated the Quonset Point NAS and NARF.  The term "Quonset Point Facility" includes all

land and infrastructure at the Quonset Point NAS and NARF, including all buildings, structures, installations, equipment, pipes or pipelines (including any pipe into a sewer or publicly owned treatment works), wells, pits, ponds, lagoons, impoundments, ditches, landfills, storage containers, motor vehicles, rolling stock, and aircraft owned by the Government.

8. Hazardous substances including TCE escaped into the environment during the course of the Government's ownership and operation of the Quonset Point Facility and have come to be located in the local soil and groundwater.

9. The "Quonset Point Site" is an area of soil and groundwater contamination located within and outside of the boundaries of the Quonset Point Facility, and includes any areas impacted by the migration of these hazardous substances.

10. The Hepburn Board, chaired by U.S. Navy Admiral Arthur Hepburn, selected Quonset Point as the location of a Northeastern Naval Air Station on or about December 27, 1938.

11. In 1939, the Government began to acquire property at Quonset Point to construct the Quonset Point NAS.

12. The Government commissioned the Quonset Point NAS on July 12, 1941.

13. Beginning in 1941 and continuing through the early 1970s, thousands of U.S. Military and civilian Government employees worked at the Quonset Point NAS and NARF.

14. Widespread use of TCE and other volatile organic compounds ("VOCs") by the Government at the Quonset Point Facility began soon after the NAS's commissioning and continued unabated through the duration of the Government's ownership and operation of the Quonset Point Facility.

15. On or about November 1, 1941, Overhaul and Repair ("O&R") Department operations began at the Quonset Point Facility. The Government overhauled hundreds of aircraft and hundreds of aircraft engines each year at the Quonset Point NAS and NARF.

16. As a part of its O&R operations, the Government utilized large quantities of TCE and other solvents and chemicals in various pieces of equipment owned by the Government, including degreasers, tanks, and stills located at the Quonset Point Facility.

17. The Government used solvents including TCE during a number of phases of the aircraft and aircraft engine overhaul and repair process.

18. In the mid-to-late 1940s, the Government owned and operated at least two large TCE vapor degreasers in Building 60 at the Quonset Point Facility. These degreasers contained tanks with drains that discharged TCE into a common trench approximately three feet wide and eight inches deep, located approximately four feet below floor grade in Building 60. These degreasers released TCE into the environment during the time the Government owned and operated the Quonset Point Facility.

19. When using the degreasers, Government employees placed parts requiring cleaning into the degreaser tanks. As the Government employees lifted the parts from the tanks, TCE dripped off of the parts and settled in the area below the grating level of Building 60, releasing TCE into the environment during the time the Government owned and operated the Quonset Point Facility.

20. After a fire destroyed part of Building 60 in 1948, the Government installed and operated an underground "Tank Farm" south of Building 60. The Tank Farm included a 1,500 gallon tank used by the Government for TCE storage. During the time the Government owned and operated the Quonset Point Facility, there were significant quantities of TCE released into

the environment from the Tank Farm.  Sampling conducted by the Government in 1989 revealed high concentrations of TCE in the soil immediately under and near the Tank Farm.

21. During the Government's ownership and operation, the Quonset Point Facility included other facilities, such as pipes, stills, solvent-water separators, and other equipment, that carried or contained TCE.  TCE was released into the environment from these facilities during the time the Government owned and operated the Quonset Point Facility.

22. The Government utilized TCE in other locations and for other purposes at the Quonset Point Facility, including at the Building 488 paint shop.  Building 488 included an extensive floor drain and trench system.  TCE entered the environment through this drain and trench system during the time the Government owned and operated the Quonset Point Facility.

23. TCE and other hazardous substances were also used by Government employees of the Mechanical Maintenance Department for various cleaning and degreasing uses.  These operations released TCE and other hazardous substances into the environment during the time the Government owned and operated the Quonset Point Facility.

24. The Government utilized solvents in the Building 420 Radio Radar Shop, in which acid emersion tanks and at least one degreaser were located.  These operations released solvents into the environment during the time the Government owned and operated the Quonset Point Facility.

25. The Government conducted aircraft engine tests at the Quonset Point Facility.  At the test cell area, the Government constructed various trenches and pits, including a so-called "dump trench."  An underground plume of VOCs is located in close proximity to this cell trench and pit system.  This trench and pit system released VOCs into the environment during the time the Government owned and operated the Quonset Point Facility.

26. The Government decommissioned the Quonset Point NAS and NARF on June 28, 1974.

27. Electric Boat began use of the Quonset Point Facility, located on part of the former Quonset Point NAS and NARF, in 1974.  At the facility, Electric Boat manufactures major submarine components under contract for the Government.  The completed submarine hull cylinders are outfitted with tanks, propulsion and auxiliary machinery, piping, wiring and lighting, and special hull coatings and are then transported to Groton, Connecticut or Newport News, Virginia, for completion.

28. Several multi-phased environmental site investigations were conducted at the Site between 1992 and 2002.  A 1992 Phase I Environmental Site Assessment initially identified 64 on-site and 14 off-site Areas of Interest.

29. The initial site investigation conducted between 1994 and 1996 included site-wide soil and groundwater sampling programs.  Additional Site investigations occurred between 1998 and 2002.

30. The various investigations have identified at least one area of dense non-aqueous phase liquid containing TCE and four discrete plumes containing TCE, vinyl chloride, other VOCs, and other hazardous substances in Site groundwater.  Vinyl chloride is a breakdown product of TCE.

31. On February 5, 2007, Electric Boat and the State of Rhode Island entered into an Administrative Settlement Agreement and Order on Consent for Recovery of Response Costs requiring Electric Boat to reimburse the State of Rhode Island for its past and future response costs at the Quonset Point Facility.

## **FIRST CLAIM FOR RELIEF**

*(Owner/Operator Liability under CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2), and CERCLA § 113(f), 42 U.S.C. § 9613(f))*

32.     Plaintiff realleges and incorporates herein by reference the allegations in paragraphs 1 through 31 inclusive, as set forth in full.

33.     The Quonset Point Site, where TCE and other hazardous substances have come to be located, and the Quonset Point Facility are "facilities" as defined in Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

34.     TCE and the other solvents used by the Government at the Quonset Point Facility are all "hazardous substances" as defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

35.     The "release and threatened release" of TCE and other hazardous substances at the Quonset Point Site and Quonset Point Facility during the Government's ownership and operation of the Quonset Point Facility have caused Plaintiff to incur response costs, as defined in Section 101(25) of CERCLA, 42 U.S.C. § 9601(25).  Plaintiff has incurred and will continue to incur substantial additional response costs at the Site.

36.     Plaintiff's response actions taken at the Quonset Point Site, and the costs incurred in connection therewith, were and are consistent with the National Oil and Hazardous Substances Contingency Plan, as codified at 40 C.F.R. Part 300 ("NCP").

37.     Plaintiff has satisfied any and all conditions precedent to the undertaking of response actions, the incurrence of response costs, and to the recovery of those costs under Section 107 of CERCLA, 42 U.S.C. § 9607.

38.     The Government falls within the class of persons liable for past and future response costs under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), because:

      a.    The Government owned the Quonset Point Facility at the time of disposal and release of these hazardous substances.

      b.    The Government operated the Quonset Point Facility at the time of disposal and release of these hazardous substances.

39.    As an "owner" and "operator" at the time of disposal of contamination at the Quonset Point Facility, the Government is liable to Plaintiff, pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for the response costs related to the Quonset Point Site that Plaintiff has incurred and will continue to incur in the future.

40.    In the alternative, the Government is liable to Plaintiff, pursuant to Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), for the response costs related to the Quonset Point Site that Plaintiff has incurred and will continue to incur in the future.

## SECOND CLAIM FOR RELIEF

*(Arranger Liability under CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3), and CERCLA § 113(f), 42 U.S.C. § 9613(f))*

41.    Plaintiff realleges and incorporates herein by reference the allegations in paragraphs 1 through 31 inclusive, as set forth in full.

42.    The Quonset Point Site, where TCE and other hazardous substances have come to be located, and the Quonset Point Facility are "facilities" as defined in Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

43.    TCE and the other solvents used by the Government at the Quonset Point Facility are all hazardous substances as defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

44.    The "release and threatened release" of TCE and other hazardous substances at the Quonset Point Site and Quonset Point Facility have caused Plaintiff to incur response costs,

as defined in Section 101(25) of CERCLA, 42 U.S.C. § 9601(25).  Plaintiff has incurred and will continue to incur additional response costs at the Site.

45. Plaintiff's response actions taken at the Quonset Point Site, and the costs incurred in connection therewith, were and are consistent with the National Oil and Hazardous Substances Contingency Plan, as codified at 40 C.F.R. Part 300 ("NCP").

46. Plaintiff has satisfied any and all conditions precedent to the undertaking of response actions, the incurrence of response costs, and to the recovery of those costs under Section 107 of CERCLA, 42 U.S.C. § 9607.

47. The Government falls within the class of persons liable for past and future response costs under Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).  The Government arranged for the disposal of wastes used at the Quonset Point Facility, controlled operations there, directed and supervised the use, storage, transportation, and disposal of waste, and knew or should have known that the generation and disposal of wastes was inherent in the production processes performed by Government employees or contractors at the Quonset Point Facility.

48. As an "arranger" with respect to the contamination at the Quonset Point Site, the Government is liable to Plaintiff, pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for the response costs related to the Quonset Point Site that Plaintiff has incurred and will continue to incur in the future.

49. In the alternative, the Government is liable to Plaintiff, pursuant to Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), for its past and future response costs related to the Quonset Point Site.

## THIRD CLAIM FOR RELIEF

*(Declaratory Relief Under CERCLA § 113(g), 42 U.S.C. § 9613(g))*

50.   Plaintiff realleges and incorporates herein by reference the allegations in paragraphs 1 through 49 inclusive, as set forth in full.

51.   An actual legal controversy has arisen and now exists between Plaintiff and the Government, and Plaintiff seeks a judicial declaration of rights and legal relations with respect to the Government pursuant to CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2) and 28 U.S.C. § 2201.  Plaintiff contends that the Government is jointly and severally liable to Plaintiff under CERCLA Section 107(a), 42 U.S.C. § 9607(a), and Section 113(f), 42 U.S.C. § 9613(f), and that the Government is liable to Plaintiff for its past, current, and future response costs related to the Quonset Point Site.

52.   Plaintiff is informed and believes, and based thereon alleges, that the Government contends in all respects to the contrary.

53.   A declaratory judgment is appropriate and is in the interests of justice because, among other reasons, it will obviate the need for multiple lawsuits, thereby providing a complete resolution of the disputes between the parties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Electric Boat Corporation, prays for a judgment against the Government as follows:

A.   For cost recovery and/or contribution from the Government under CERCLA for all of Plaintiff's past, current, and future response costs and damages relating to the Quonset Point Site, including those paid to the State of Rhode Island;

  B.  For a declaration that the Government is liable under CERCLA for all Plaintiff's past, current, and future response costs and damages relating to the Quonset Point Site;

  C.  For pre-judgment interest at the maximum rate allowable by law, from the time Plaintiff incurred its response costs and damages;

  D.  For Plaintiff's reasonable attorney's fees and costs of investigating the potential responsibility of the Government, and for conducting other reasonable and related investigations;

  E.  For Plaintiff's costs of litigation; and,

  F.  For such other and further relief as the Court may deem just and proper.

Dated: October 30, 2015      Respectfully submitted,

              /s/ Gerald J. Petros
              Gerald J. Petros (R.I. Bar No. 2931)
               gpetros@hinckleyallen.com
              HINCKLEY ALLEN
              100 Westminster Street, Suite 1500
              Providence, RI 02903
              (401) 274-2000
              (401) 277-9600 (fax)

              Michael K. Murphy
               (*pro hac vice* application pending)
               mmurphy@gibsondunn.com
              David Fotouhi
               (*pro hac vice* application pending)
               dfotouhi@gibsondunn.com
              GIBSON, DUNN & CRUTCHER LLP
              1050 Connecticut Ave., N.W.
              Washington, DC 20036
              (202) 955-8500

              *Counsel for Plaintiff Electric Boat Corporation*